The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the 4th Circuit, are admonished to draw an eye and give their attention. For the Court is now sitting. God Save the United States and this Honorable Court. Good morning everybody. Please be seated. I want to welcome everybody to the U.S. Court of Appeals for the 4th Circuit. We have four cases on for hearing. First up is 23-4610 and 23-4614, United States v. Chavis. Ms. Harrell. Thank you, Your Honor. Good morning. My name is Emily Harrell and I represent Brandon Chavis in this matter. There are several issues raised in the briefs, but I think I'd like to focus the Court's attention on the argument regarding the District Court's abuse of discretion in permitting Ms. Shearmire Wood to testify as an expert on the use of the true allele probabilistic genotyping software. Our contention, Mr. Chavis' contention, is that the District Court abused the discretion by permitting her to testify because true allele is not reliable based on the unavailability of the source code of the software and because she had no background herself in computer programming. Can I ask you a question about that statement, the non-availability of the source code? My understanding is that the code is, in fact, available subject to certain restrictions and the like. So what's your view of the record on that point? The government makes that argument based on its review of the website of cybergenetics. There's no information in the government's brief as to when that information may have been posted on the website. In other words, how recently cybergenetics is making its source code available. How much do you know about the source code? Do you know what it is they're really asking for? What do I know about source codes? I mean, do you really think that they have released that source code? No, sir. Or released the opportunity test? There's nothing that indicates that this entity has released a source code, which is the instructions on how the computer works. It's my understanding. You're asking that from a website. If the website is, I want the government to tell me what that website is that indicates that this particular company has released its source code. There have been cases in which the court has ordered it just in those cases alone. Maybe out of New Jersey or whatever. But there's no public release of a source code. You release that source code, you might as well give away the company. And for the two or three cases where I've noticed that the court has ordered the release of the source code, the government then stepped aside and dismissed, either dismissed the count, which was affected by that information. Why didn't the court bring this up in the court below? There's no discussion in the court below as to why. You start out and say it's not reliable, but it looks like this is something you found out later on and you didn't bring this up. Your Honor, I was not trial counsel in this matter. That might be the case. And you often give it for that, but you have to answer for the trial counsel in this matter. I think the best answer I can give, Your Honor, is that by making the argument that Ms. Shearmire Wood was not familiar with what happened within the black box of the computer programming, that she would not actually know whether the outcome was reliable. The outcome of the- This is a huge issue. It's all over. I mean, there's no way you'd miss this. You would know that if you were going to deal with probabilistic genotyping, you know that the big issue out there, is it really accurate? Do you know what the source code is? Because it's no question she's an expert on it. But what she's an expert on is something the computer analyzed, and you need to know who and what instructions was given to that computer. But it wasn't brought up. That is my understanding of the record, Your Honor. The best I can do is to say that by making the argument that she was not familiar with what happened once the input was put into the computer and you got the output, that that was an attempt to make that argument. You know, in the abstract, certainly it's hard to argue that DNA evidence isn't compelling, sometimes overwhelming in deciding a case, a criminal case. A jury might look at this and say game, set, match, and over. But the facts of this case, I'm sure you're going to push back against this, but there was a ton of other evidence in this case, albeit mostly, if not exclusively, circumstantial pointing to your client as the perpetrator of these robberies. So why isn't, in this particular case, the admission of this evidence harmless? I think because no victim of the robberies made an in-court identification of Mr. Chavis and put him at the scene of those robberies. They had all kinds of descriptions of the clothing, the weapon used, you know, the cell phone evidence, location data, the text between he and his, as he called it, wifey, as to where they were. And to put icing on the cake, the so-called wifey apparently reading about their exploits online and keeping records of news articles about the robberies. I mean, that's pretty damning evidence, I think. The evidence would appear to point in Mr. Chavis' direction. I would say so, yeah. I do think that identification of Mr. Chavis was of utmost importance because he had not been identified by any of the victims as the perpetrators of the robberies. But you understand that the district court has the right to use circumstantial evidence. It does not have to be direct evidence or identification. I understand that. But for some reason, the government particularly believed that this evidence was important. And so they're the ones that brought the evidence, and it seems to me of paramount importance. And so, you know, all this other evidence may be sufficient or there may be a lot of it, but the DNA evidence seemed to be particularly important. Well, that's not the standard in terms of homicidal. What you just said right there, you said it may be sufficient. Well, that's going to be enough right there. Our contention has been in the briefing that it was not sufficient. And, you know, we've provided information as to why it was not sufficient and why a reasonable jury would not have determined without this DNA evidence that it was not Mr. Chavis, was Mr. Chavis. Well, maybe the reason the witness didn't identify him is because he had on a ski mask. And there are a lot of cases in which circumstantial evidence is sufficient for identification. Particularly in the case, this is pretty strong evidence. Our contention is that the evidence that was presented was not sufficient and without the DNA evidence, which made it relevant, but it's not reliable. Is it your position that in each and every case, the government in order to use this kind of DNA evidence would have to disclose or at least you should be able to cross-examine as to the source code? I mean, because there was evidence by the expert explaining how the process was utilized to get to the DNA results. And admittedly, she wasn't an expert on the source code, but she did testify as to how the DNA evidence was manipulated and the results achieved. So, I mean, is it your argument that in each and every case, the government has to sort of go into excruciating detail as to the source code? I think it's particularly important in this case because neither Dr. Oglesby nor Ms. Shearmire Wood did a, I'll say standard manual analysis of the DNA, which if you look, Dr. Oglesby did not do the analysis because some of the information fell below the 75 RFU threshold that the Virginia Department of Forensic Science sets. She sent that information to Ms. Shearmire Wood. Ms. Shearmire Wood also did not do a manual analysis based on the same threshold information, but she testified that she could have. So what you've got is the human beings not doing any analysis of their own and giving the computer the work to do. And because the computer is doing the analysis, you have to ensure that what the outcome is is correct. And so to answer your question, you have to understand what the computer is actually doing. And if that means looking at the source code, I would absolutely say yes, that they do have to, either the government does or at some point, cybergenetics would have to let somebody look at their source code to ensure that the program is operating the way it's supposed to. The theories, the statistical analyses, yes, those things have been peer-reviewed and published and that sort of thing, but not with the source code. If you got the source code, what would you do with it? Who would analyze it? I think you'd have an expert analyze to determine whether the 170,000 lines of source code are accurately implementing the theories, the statistical theories and otherwise, that are being used by true allele to be able to, you know, analyze down to some very low number of RFUs to determine whether your client is included or not. Well, but then I guess going back to Judge Wood's question, we're left with all kinds of speculation because none of that happened below because the defense never raised the issue. My position would be that by arguing that Ms. Schirmer was not able to talk about what happened once the information was inputted, that that would be sufficient to raise the issue. All right. Thank you, Ms. Yarbrough. Okay. Thank you. Mr. Woodward. Thank you, Your Honor. Good morning. May it please the Court. Your Honor, as you're aware, I'm here on behalf of Ms. Beasley, and the only argument that I have is sufficiency of the evidence. I have a few comments I'd like to make. The DNA evidence obviously did not apply to Ms. Beasley. I'd like to focus particularly on the gun charges. I read the government's brief, and they talk about their theory to know that she knew a gun was used, was that there were newspaper articles that she even said in their brief that when she found a gun or Mr. Chavis confronted her with a gun, she called the police, and I want the Court to understand that that's how they found the gun. My client was his girlfriend. Sometimes I described him as frenemies, wifey, whatever term they were using on that day. They had a tumultuous relationship. But the gun with the yellow dot sight, which I'm sure the Court saw in the record, was the gun that was found under a tire of a car over in one of the housing projects in Norfolk. Ms. Beasley called the police and turned them on to Mr. Chavis. That's how they found that gun. I looked back through this record again, and I understand for 40-plus years, circumstantial evidence and the inferences a jury and a court can draw, but there was no evidence presented that Ms. Beasley ever saw that gun. When the videos were shown and the court didn't see them, but they're in the record, I mean, the gun was concealed. And so I would ask the Court to look closely at those cases. As the Court's aware, on one of the gun counts and one of the robbery counts, the jury acquitted Ms. Beasley and then convicted her of the ones after that. And, of course, those gun charges are what drove her sentence in this case. I mean, she got 28 years, I think it was, on gun charges. The government had charged her with something that would have given her 35. The other thing that I would ask to talk about real quickly is that lottery ticket. Yes, she cast a stolen lottery ticket, but there was no evidence that she knew it was part of a robbery. I analogize that. It would be no different than if someone gives you a $20 bill that's counterfeit and you go into a store and, you know, pass it, then it's a counterfeit bill, but, you know, you're not going to be guilty of a crime unless you know. But isn't that, I mean, that was evidence that was put before the jury. Isn't that for the jury to weigh and decide based on all the other evidence? I think she admitted she had the stolen lottery ticket. She admitted that it's her Volvo that's at the robberies. So the jury has a right to consider the circumstantial evidence, and they did, and they decided that it linked her to the robberies. Absolutely, Your Honor. I mean, the jury heard all that, considered all that. No question about it. I see my time is up. I'll have a couple minutes left. Thank you. All right. Thank you very much. Ms. Bensinger. Good morning, and may it please the Court. Samantha Bensinger for the United States. There are several issues before the Court this morning, but I'd like to begin with the Trulio issue that we were discussing a few moments ago. Do you need it? No. So the Court So you don't have to rely upon that. You can argue a homilious error because the evidence was sufficient. Absolutely, Your Honor. We believe that the Trulio issue is not difficult, and so the Court could certainly hold that the district court did not abuse its discretion in permitting Shearmeyer Wood to testify. But, of course, you are more than welcome to decide this on harmless error grounds. There was more than enough evidence having nothing to do with Trulio implicating Chavis here. Why did you bring it if you didn't need it? It was available to us, and it was surely helpful. I think, you know, as some of the argument this morning has shown, it's helpful to be able to inform the jury that the analysis Are you aware of the reliability problems with it in terms of the source code not being available? I don't think that there are any availability problems, Your Honor, and I'd like a chance to respond to the source code question directly. You asked what Web page makes the source code available, and the answer is because it's a proprietary trade secret, the source code is not itself posted on any public Web site, but the cyber genetics Web site, has a Web page explaining how defendants, defense attorneys, and defense experts can access the source code by completing a nondisclosure agreement. That's enough in a court of law that a Web site says you can do it, but no one in court has ever gotten it in that manner. Do you think that's enough for the government to represent to us that you looked on a Web site? You don't even know who did the Web site. You have no idea who put that Web site or where that information. Do you know the reliability of that? So the Web site belongs to the company that produced TrueAllele. How do you know that? Cyber genetics is the company that developed TrueAllele. I understand that, but who testified to that fact? You saw it online. You're not seriously going to represent this court. You saw something on a Web site and say it's true. Because the issue pertaining to the source code was never raised before the district court, there was not testimony on this, but I can assure the court that source code has been disclosed in prior litigation. Well, let me say this to you. Go back and do some more research, and you're going to find out they have never released that source code. They allowed some testing. There have been some cases in which courts, district courts, have allowed it in limited circumstances just for those cases. That's the big issue right now as to whether they were released, as you say, that proprietary issue which they considered to be protected, because it's the basis of the algorithm that forms the whole company. They're not going to release that easily. And I don't think anything you find on the Web site is going to tell you any differently, and if you're telling that right now, then perhaps we should remand and say, okay, go ahead and release it. And I don't think that's going to happen in that kind of a way. Those cases typically have been just dismissed. They're dismissed for a reason. They don't want to release that. The only problem here with the source code, which is why I pointed you back to the sufficiency, is it can be just like taking footprints and all kinds of other stuff for years and years of saying crack cocaine is worse than powder cocaine. We rely on experts. At the end of the day, they rely on a computer-generated analysis, and we don't know the instructions that the human being made to the computer, which comes from the source code. That's the problem you've got in this case, which is reliability or validity, I should say. That's the problem with it. I have three responses, Your Honor. First, setting aside the fact that Chavis forfeited the argument pertaining to the source code, I just want to draw a distinction between. That's a nice thing to set aside. You probably ought to stick with that argument and say she forfeited because you didn't bring it up at all. We typically don't consider cases on appeal if you didn't bring it up at all. I would just set that aside. I would probably jump all over that. I certainly agree that the court can rely on that. I just wanted to be responsive to Your Honor's question and offer three responses that I think are more directly on point. First, I want to distinguish between a wholesale release of the source code, on the one hand, and the kind of access that defense attorneys and experts need, on the other hand, in order to confirm it's reliable. Even if CyberGenetics has not released its source code wholesale, there have indeed been cases, including in the Western District of Pennsylvania, United States v. Ellis, in which. The blank from 2021 you're talking about? I believe it was several years ago, Your Honor. That's. They didn't. They only allowed it just in that case. They didn't make that public. Right. The distinction I was drawing was between public release on the one hand. It was a court order. They didn't voluntarily give that up. It was a court order. There's no court order here that would allow that. I agree. There's no court order here, and the reason there's no court order here is in part because Chavis never asked for the source code. But I think. So we're back to the forfeit. So my second response, Your Honor, is that even though the source code has not been publicly released, the kinds of calculations and the mathematical algorithms on which CyberGenetics truly overlies have been. And I think the Supreme Court and this Court have said that district courts have considerable leeway. What do you mean have been? If what you need is a source code, which are the human instructions to that computer on what you need, what you are doing, how the analysis is based upon, you're talking about the ultimate testing of it. I'm talking about the kinds of calculations that Trulio is running, as distinguished from the computer language that instructs the software how to run those calculations. Who instructed the computer to make the calculations, not what was done, but the initial instructions, the source code. Understood, Your Honor. And I think that just brings me to the third point, which is that the district court here assessed the reliability of Trulio based on validation studies, a low known error rate, peer review, and other techniques that confirmed for the district court that Trulio is generally reliable and was reliably applied here. Reliability, but not validity. Validity goes more to the source code aspect of it. For what it's worth, I do think the validation studies speak to the validity in addition to the reliability. I'm happy to walk through how those validation studies work, if that would be useful. I probably would go back to my initial question. Do you think you need it? And the answer to that question is no, Your Honor. You could certainly decide this case on harmless error grounds. Let me ask you about that, because maybe that's right. But, you know, it's hard to, in most cases, I think it would be difficult to say that admission of DNA evidence is harmless when you've got numbers such as, and I'll just read these, the ultimate conclusions of the expert was that a match between the unknown liquid swab, in this case the urine sample I guess that was found on the ground in Mr. Chavis, is 33 trillion more times probable than a coincidental match to an unrelated African-American person, 26 quadrillion times more probable, I don't even know what that number means, and then 1.8 quadrillion times more probable than a coincidental match. I mean, a jury hears those kinds of numbers in the abstracts and says, what are we doing here? Game, set, match. It's all over. So, and maybe this is the outlier case, given all the other evidence that was in the record, but this is really powerful evidence, don't you think? And that's the reason why you wanted it in evidence. I don't dispute that it's powerful evidence, Chief Judge Diaz, I completely agree, but I think this is maybe the outlier case where there was so much other evidence that you could find any error in the admission of the testimony harmless. There were four categories of evidence implicating Chavis having nothing to do with DNA. I'd be happy to speak to those more if that would be helpful to the court. I'll start with the clothing and MO evidence. The robber here consistently targeted 7-Elevens, used a Volvo SUV as the getaway car, wore a black inside-out hoodie, and often an orange reflective construction vest. That is exactly the outfit that Detective Strano spotted Chavis wearing following the robberies on October 28th, shortly before approaching Brandon Chavis, having a conversation with him, and subsequently identifying him in court. Second, the gun. We spoke a little bit about this earlier, but Officer Haywood recovered a gun on November 15th, shortly after encountering Chavis. That gun had a number of characteristics that matched the gun used in the Hampton Roads robberies. For example, the yellow color above the front sight, certain paint chips that were similar, and Detective Flanagan in court walked through those similarities between the guns. That was obviously very strong evidence. Next, the call detail records. Jason Dufault testified that Chavis' phone's call detail record showed that it was in the general area of the robberies at the time they were committed. And finally, the text messages. As Chief Judge Diaz alluded to earlier, Chavis had Beasley saved in his phone as wifey, and there were a number of texts before the robbery, during which it showed that they were coordinating in advance of the robbery. So I think that's more than enough evidence to say, having nothing to do with DNA, that he was guilty. Yeah, I guess the moral of this story is public urination is not a good thing in most cases. It's an even worse idea if you're going to engage in a string of robberies. So maybe you're right. Maybe this is the case where DNA evidence is just the icing on the cake. But it is troubling because it's just so – the numbers are just so overwhelming. I think a jury could easily be – just ignore all other evidence to the exclusion – I mean, just focus on this evidence to the exclusion of nothing else. Understood, Your Honor. Let me – and let me maybe just take a moment to say something about the reliability of Trulia, all separate from the source code, if I may. This software has been around since the 1990s. It was used – We're moving from a sufficiency back to this genotype – this probabilistic genotype, to discuss reliability and validity. You just heard what he just said there. I was just trying to address what I understood to be Chief Judge Diaz's concern that this evidence is so persuasive that a jury could be moved by it, so I just wanted to communicate to the court why I don't believe there was any abuse of discretion in admitting it in the first place. I'm happy not to get into that if the court would prefer. Go ahead and proceed with it. But the point Judge Diaz makes, which I would agree, is you put in numbers like trillion and quadrillions. That's – we're now talking from a harmless error standard. Is that something that prejudices a jury to think it's overwhelming? You've jumped back into the very basis for it getting in in the first instance, which is fine. But, you know, so we'll get back into that discussion if you want to. I think there are two paths to decision here, and the court could follow either. One would be to hold that any error in the admission of Shearmire Woods' testimony was harmless, notwithstanding those statistics. As I mentioned, there was so much other evidence that I think that path is available to the court, but I was just trying to address if the court wants to alternatively hold that there was no abuse of discretion and speak into Trulial's reliability. So the only other thing that I wanted to add there was that Trulial was used in the early 2000s to identify human remains following the 9-11 attacks. It's been used in over 1,000 criminal prosecutions. Chavis does not cite, and I am not aware of any state or federal court holding it unreliable under either Daubert or Frye. So I don't think that there is any serious issue here as to Trulial's reliability. Can I ask you to address Mr. Woodward's argument about Ms. Beasley's involvement in the gun, which he claims drove the sentencing in this case? And as I understand his argument, is that there just isn't any evidence indicating that Ms. Beasley understood that there would be a gun involved, even if she was guilty of these offenses, that she knew that Mr. Chavis was going to be using a gun? Yes. I think there are three pieces of evidence from which the jury could have reasonably inferred that she had the kind of advanced knowledge that he would be brandishing a gun that's required under the Supreme Court's decision in Rosemont. So the first of those is what Mr. Woodward alluded to, which is that on October 27th, she accessed an article about the robbery at 7-11 on Indian River Road a couple days prior, and that article described it three times over as an armed robbery, stating that the robber brandished a firearm. Instead of withdrawing from the scheme after that, she proceeded to commit four more robberies with Chavis. So I think that reflects not only that she had the kind of knowledge required for the robberies after she read that article, but it also could shed some light on the kind of knowledge she had before, insofar as she didn't withdraw from the scheme. So that's one. The second is surveillance camera footage, generally showing the Volvo pulling up to the robberies, Chavis getting out of the passenger side door, her waiting a matter of mere moments before he returned to the car. But I think specifically the 6-1 video series that I believe the Court can do itself shows on the subway robbery, the car pulls up, Chavis gets out after presumably urinating. He reaches back into the car to grab something. I think the jury could have reasonably inferred that he was grabbing a firearm, and Beasley, who is in the driver's seat, could see him doing so. So that's the second. The third is the call on November 15th to the cops reporting that Chavis had a gun. Obviously that was after the robberies charged here, but we think it can still reflect Beasley's general knowledge that he had a gun. And I think the thing that's important here is the gun was not sort of ancillary to the criminal scheme. The whole scheme here was armed robberies. Sort of as a matter of common sense, cashiers don't typically hand over cash in a matter of mere moments consistently if, you know, something like a gun is not being brandished. So we think, given the standard of review here, viewing the evidence in the light most favorable to the government, there was more than enough for the jury to reach a guilty verdict. Do you have anything else? If there are no further questions, we would ask that the Court affirm the convictions. Thank you. Thank you very much. Ms. Harrell? Ms. Harrell. I just wanted to say a couple of things briefly about the TrueAllele software. The government believed that the DNA evidence was so important to their case that they ran it twice. I understand the first time they ran it, Mr. Chavis had objected to the way his cheek swab was collected, and so they, you know, did a second cheek swab to ensure that everything was done correctly. But they ran both of the samples, sorry, they ran the sample twice. So evidently that DNA evidence was important enough to them to do it twice and enter into evidence. So even though there is a lot of other evidence, the government believed it was so important that they do that and get it into evidence. As to the source code itself, there have been some cases, I believe the Ellis case, and there was a case I think in Fairfax that the court directed that the source code be produced under protective order. It's my understanding, and I'll have to double check if the court would like, but I think that in the Ellis case the government ended up dismissing the charge after that court entered the protective order. And the case in Fairfax, I don't have access to state court records so I can't verify this, but I'm fairly sure that that case did not go forward after the court entered the protective order. The problem we've got is you never asked for it down in the court below. That's a problem. And now to come on the appeal and say what the court didn't do and what the court should have done, you didn't give the court a chance to do it. They didn't bring it up at all. You, in the sense that the counsel before you, of course. Understood, Your Honor. As far as the reliability of true allele, I would just, the larger picture as far as the Daubert reliability test is impacted by the source code implementing the statistical theories and everything that produces the result. So that's how important the source code is. And it comes up with this astronomical number, as Chief Judge Diaz noted. But the problem again is that the district court didn't hear any of that. And the district court has put it in a position of determining whether to admit this expert. Abuse of discretion is there. You know, no one's brought up this adversarial situation. I mean, what you're saying is pretty much what I said the counsel was doing. You might have gone to the website and pulled this stuff up. And, you know, now you sound like you know what you're talking about. But there's no evidence in the record from testimony or anything but the district court. No chance one to even deal with this. Well, I think that. And it wasn't like it was a secret. I mean, you could have found it out. I mean, it wasn't like they just discovered this, you know, when you filed this. Everything you know right now was known then. I haven't heard a case yet that has come out since this case, or anything that wasn't in existence when this trial was going on. I believe that's correct. As, you know, I can, you know, judge, sorry, at the motion and limine hearing, I believe she was asked about her background and computer programming. And she indicated she did not have a background in computer programming. Now, whether that's sufficient to raise the issue or not, I think that that could be. And I see that my time is up. Thank you, Your Honor. Thank you, Ms. Harrell. Mr. Woodward. Your Honor, just one minute or a few seconds on the three things the government said about the gun. I would go, first of all, the newspaper article was on her phone. There was no evidence. There was a ton of stuff on her phone that she read it. I mean, it's on her phone. I don't contest that. And it did say there was an armed robbery. If you look at that six series videos, which I looked at until my eyes crossed, there is nothing on there that shows Mr. Chavis reaching back into a car and getting a gun. It shows him standing there for a minute and a half urinating. He kind of leans back into the car and he walks off. So that's, you know, you get into, I guess, semantics in this setting. What's the difference between speculation and an argument? But at best, that he reached back into the car and saw there was a gun laying on the seat that Ms. Beasley saw, that to me is speculation, but it's certainly not evidence. At best, it's an argument. And finally, on the November 15th issue, you've got to remember, Ms. Beasley called the police because Mr. Chavis threatened her with that gun. That had nothing to do with these robberies. Now, it helped the government because she was afraid of Mr. Chavis, and they went and found the gun and tested it. But I fail to understand how her doing that in her neighborhood out in front of her home would have anything to do with showing that she had knowledge that a gun was used during the robberies. Thank you, Your Honor. Thank you very much. Mr. Woodward, I see that you're court-appointed. I want to thank you on behalf of the court for taking on the appointment. As you well know, we can't do our work without lawyers who are willing to take on these cases, and so we're grateful to you. We're grateful to the lawyers for being here this morning and arguing their causes on behalf of their respective clients. We'll come down and greet you and then move on to our second case.
judges: Albert Diaz, James Andrew Wynn, DeAndrea Gist Benjamin